### BARRETT *v.* MILLER.

1. Trusts—Constructive Trusts—Purchase of Lands—Interest of Intermeddler.

Complainant, knowing of an offer to sell a tract of land at a certain price, falsely represented to defendants that he had an option on a part of it at that price, and offered them the benefit of the option, reserving to himself an undivided interest in the tract as his compensation. His offer being accepted, an option was procured from the owners, who declined to give an option other than for the entire tract at the original price direct to the purchasers, including complainant, defendants, and a broker who had the lands for sale. On seeing the option, defendants refused to complete the purchase, and entered into negotiations with the owner direct, ultimately securing the lands at the original offer. *Held,* that complainant was not entitled to recover any portion of the land from defendants on the theory that they held in trust for him the part of the tract he attempted to withhold from them, or the undivided interest in the tract he proposed to secure for them.

2. Same—Confirmation.

A letter from defendants to the owner, written after discovery of the true condition of the offer, directing him to make the deed, provided for by the original option, to defendants, leaving out complainant, was not such a confirmation of the option, made after discovery of the fraud, as amounts to forgiveness of the attempted deceit and entitles complainant to the benefits of the option.

Appeal from Kent; Perkins, J. Submitted February 6, 1906. (Docket No. 24.) Decided July 3, 1906.

Bill by Ervin E. Barrett against Ward B. Miller and others to establish an interest in certain land. From a decree for complainant, defendants appeal. Reversed, and bill dismissed.

Complainant, a timber cruiser of experience, learned that his son-in-law, one E. J. Hart, of Grand Rapids,

Mich., had been employed in the capacity of a broker to dispose of 9,658.10 acres of land, situated in Gogebic county, Mich., at the price of $5.75 per acre, for a commission of 2½ per cent. The land was valuable chiefly for the growing timber, and, the owners' estimates of the quantity of the timber being unreliable, complainant, upon the request of Hart, was employed by Hart, by the consent of the owners, to make a new examination of the lands and a new estimate of the timber, his services to be paid for by $465—by the owners if a sale was made, and one-half that sum to be paid by the owners and one-half by Hart in case a sale was not made; the estimates to belong to the owners. Complainant and his son visited the land and did make an estimate, spending some two months in the work. Returning to Grand Rapids, he found that Hart had not yet procured a purchaser for the land, and he conceived the idea of himself procuring a sale of a portion of the lands at the price asked by the owners for the entire tract, and to secure for himself that portion of the lands not so sold, as well as an interest with the purchasers. Without making any arrangements with the owners, and without the knowledge or consent of the owners, he set about the carrying of his scheme to a conclusion. He made an arrangement with Mr. Hart, later reduced to writing and dated back to September 9, 1903, as follows:

"Memorandum of agreement made this 9th day of September, A. D. 1903, between Edward J. Hart of Grand Rapids, Mich., party of the first part, and Ervin E. Barrett, of the same place, party of the second part,

"*Witnesseth:* That said party of the second part agrees to secure customer or customers to accept on or before October 5, 1903, together with said second party, an option on lands in T. 46—45 and T. 47—45, Gogebic county, Michigan, owned by Wakefield and Thomas Estates; said customers to pay the sum of $56,000 or approximately $8 per acre for 7,040 acres of said lands contained in sections 13, 14, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, and 35 of T. 46—45.

"That said party of the first part as agent for said lands, agrees, in consideration of services of said party of second part in securing such customers, and negotiating deal, and in consideration of the sum of $5.00 to instruct Charles O. Brewster, attorney for owners of said lands, to make deed to the remainder of said lands, about 2,618.10 acres in sec. 28 T. 47—45 and sections 1, 2, 3, 4, 5, 6, 7, 8, 11, and 12 T. 46—45, to said party of second part and to make deed to said 7,040 acres to customers as said second party shall direct, when said customers and said second party shall have accepted said option by depositing 10 per cent. of purchase price of $56,000.

"Dated Grand Rapids, Mich., September 9, 1903.

"EDWARD J. HART."

Complainant made two plats of the land; one containing, describing, and estimating 7,040 acres, and the other the remainder of the land. He interested certain possible purchasers, and took some of them to examine the lands upon representations as to the quality and value of the timber, and upon undertaking to pay certain expenses if the lands were not as represented. He represented that there was in existence an option, given by the owners of the land, for the sale of 7,040 acres at the price of $8 per acre, which option he could and would procure for the benefit of the purchasers upon certain conditions. At one time, at least, his proposition was put in writing and submitted in the form of a letter or prospectus to certain of the persons whom he proposed to interest. Among other things which this letter contains is the following:

"As evidence of the estimator's confidence in his figures, he has an opportunity to sell the whole property, or, rather, his option on the same, to one of the large lumber dealers in this city and netting him a reasonable profit on his investment, which consists of two months' time spent in the woods estimating the timber and securing the option. But he is so confident of the value of this property that he prefers to organize a company in which he will have one-eighth interest for his option and work, and to that end offers to stipulate in the articles of agreement that the parties furnishing the money to handle the

proposition may take any one of the following four options:

"1. He will leave the management of the property and the question of whether it is sold, if a reasonable profit on the investment is offered, or a mill, railroad, and other equipment put in and the timber worked out, entirely to the investors, and share to the extent of one-eighth interest in the profits accruing from either method.

"2. The investors to have the privilege of giving him for his one-eighth interest the timber over and above such estimates as furnished herewith.

"3. The investors to have the privilege of giving him for his one-eighth interest the profits on the transactions over and above $190,000.

"4. The investors to have the privilege of giving him for his one-eighth interest the mineral rights on the land after the timber is disposed of. * * *

"The option on this property as it now stands expires September 15th and calls for $56,000 cash. However, we believe that an extension of 30 days' time can be secured by making a reasonable showing of good faith in asking for time to confirm estimates. * * *

"You will also bear in mind that this option is on a complete transfer of the property—includes the real estate, mineral rights, and timber."

This prospectus was dictated by defendant Stevenson on or about September 10th in the presence of complainant, and who knew then that the land belonged to two New York estates, but without knowing the names of the owners, and who was told by complainant that Hart was the local agent for the lands. This prospectus was issued before any of the defendants or any persons whom they represented had made an examination of the lands. An agreement was finally made by complainant with certain persons, whose interests are now represented by defendants, to purchase 7,040 acres of land for $8 an acre, or substantially $56,000, with the understanding, however, that there was in existence an option for said lands at said price, by means of which the lands could be secured. None of the defendants had seen the option. There was in fact no option for 7,040 acres, or for any of the land, and neither Hart nor complainant knew that an option

could be procured. The agent of the owners, being applied to by Mr. Hart for an option, declined to give one until he was furnished with the names of the intending purchasers, and declined to give an option, except in accordance with the terms upon which Hart had authority to find purchasers for the land. Hart represented to the owners' agent that complainant was an intending purchaser; that some of the lands he would purchase on his own account and some of them with other persons. An option, drawn by Hart, was forwarded, but was not executed; an option in the following form being executed and returned to him, the names of the purchasers appearing therein, being furnished by Hart:

"Memorandum of agreement between Charles O. Brewster, of New York, as attorney for the estate of Cyrus Wakefield and the estate of Joseph B. Thomas, as first party, and E. A. Turnbull, of Grand Ledge, Michigan, and Edwin Owen, L. J. Stevenson, E. E. Barrett, Frayer Halladay, and Edward J. Hart, of Grand Rapids, Mich., as second party:

"The first party grants an option to and including October 5, 1903, on the lands owned by his clients in township forty-six (46), range forty-five (45), and section twenty-eight (28), township forty-seven (47), range forty-five (45), Gogebic county, Michigan, about ninety-six hundred and fifty-eight and 10/100 acres (9,658.10) at five dollars and seventy-five cents per acre.

"This option is granted to the second party jointly and severally upon the following terms:

"Said second party, or any of them, shall have the privilege of examining said lands within the period of this option and to accept the same on or before October 5, 1903, on depositing 10 per cent. of the purchase price, or about fifty-six hundred dollars ($5,600), as a guarantee to take said lands if the deeds, abstracts, and tax histories show a clear and valid title in the grantors

"Upon acceptance of said option on or before October 5, 1903, and the deposit of fifty-six hundred dollars ($5,600) in the Grand Rapids Savings Bank, to be held subject to the order of the first party, as guarantee and part payment for said lands, the proper deeds and abstracts are to be forwarded by first party to said bank for exam-

ination, according to instructions to be given by said
Edward J. Hart.

"In case the second party refuses to complete the pur-
chase of the lands, a good and valid title being offered by
the grantors, the said deposit of fifty-six hundred dollars
($5,600) is to be forfeited to said first party as attorney as
aforesaid.

"Dated New York, September 16, 1903.
        [Signed]      "CHARLES O. BREWSTER,
                "Atty. for Estate of Cyrus Wakefield
                    and Joseph B. Thomas."

There was and had been no other option. On the 5th
day of October, 1903, defendants deposited in the
bank at Grand Rapids the sum of $5,600, which they were
told by the complainant was the sum required to be
deposited according to the option. Complainant prom-
ised that the option should be deposited at the bank
at the same time and could there be examined. It was
not deposited until the next day, when it was examined
by the defendants, or by some of them, and they then
learned for the first time the owners' terms of sale. They
made a copy of it, consulted among themselves and with
attorneys, and, without communicating with complainant,
wired the New York attorney to make the deed to Luther
J. Stevenson, as trustee, and on the same day wrote him
a letter to the same effect, as follows:

                                "Oct. 6th, 1903.
"CHARLES O. BREWSTER,
        "New York, N. Y.
"Dear Sir: In accordance with the option given
by you Sept. 16, 1903, to myself and others, we deposited
$5,600 with the Grand Rapids Savings Bank yesterday,
to be paid on the purchase price of timber and land con-
sisting of about 9,658 acres located in Gogebic county,
Mich., upon our acceptance of the deeds to the property.

"As we have not perfected our organization, I am in-
structed to advise you to make the deeds running to me,
Luther J. Stevenson, trustee.

"Please advise me, upon receipt of this, when the deeds
will probably be here, and oblige,
                        "Yours respectfully.
                            "Dict. L. J. S."

Up to this point complainant is shown to have been the veriest intermeddler in the affairs of others. He had no interest in the lands, was not employed by the owners, and was not an intending purchaser of any of the lands. Both he and Hart had misrepresented—one to the intending purchasers; the other to the owners—the facts. On the 8th of October defendants appointed a meeting, at which complainant was invited to be and was present. There is controversy as to what took place at this meeting. The following day another meeting was had, at which complainant charged the defendants with an attempt to deal around him and leave him out, and the defendants charged complainant with misrepresenting the deal to them. There was further correspondence:

"10 / 12 / 1903.

"To CHARLES O. BREWSTER,
        "52 Liberty St.,
            "New York City:
    "Make no deeds to Hart or Barrett for Gogebic county property covered by option of September sixteenth. Letter follows.

                            "L. J. STEVENSON."

                    "NEW YORK, Oct. 15th, 1903.
"L. J. STEVENSON,
        "Widdicomb Bldg.,
            "G. Rapids:
    "Yours twelfth. Cannot give deed except to parties named in option, unless all, including Hart, consent. Such deed now ready. Wire answer.

                            "C. O. BREWSTER."

            "In re T. 46–47, R. 45, Michigan.
                            "October 12, 1903.
"Mr. L. J. STEVENSON,
            "Grand Rapids, Michigan.
    "Dear Sir: I acknowledge receipt of your letter of the 6th inst.
    "As all my dealings have been with Mr. Hart in this matter, I prefer that the instructions as to the names of the grantees in the deeds shall come from him.
    "I hope you will be able to arrange matters so that there will be no further delay.
                "Yours truly,
        [Signed]        "C. O. BREWSTER."

"NEW YORK, Oct. 15, 1903.

"Messrs. STEVENSON, HALLADAY, MILLER, OWEN & YOUNG,

"Grand Rapids, Mich.

"*Gentlemen:* I have received today by registered mail your letter of the 12th inst;, and note its contents.

"I regret exceedingly that any dispute should have arisen between yourselves and Mr. Hart. As the broker in the transaction, and one of the parties named in the option dated Sept. 16th, I have confined my negotiations to him as a representative of the purchasers.

"In naming grantees in the deeds, I am bound by the terms of the option, and have no right to insert the names of others without the consent of all the parties to the option, including Mr. Hart. The soundness of this proposition I am sur  you will admit upon careful consideration.

"As to the substitution of Messrs. Miller & Young in place of Mr. Turnbull, I must have a letter or telegram from Mr. Turnbull consenting to such a change in naming the grantees in the deed. Upon receipt of your letter I wire Mr. Stevenson as follows:

"'Yours twelfth. Cannot give deeds except to parties named in option, unless all, including Hart, consent. Such deed now ready. Wire answer.' Which I hereby confirm.

"At the present writing (5 p. m.) I have no reply to my telegram.

"Hoping that the matter may be speedily adjusted, I am,

"Yours truly,
"C. O. BREWSTER."

Certain deeds were prepared and executed, and instructions given, for the purpose of permitting the lands to be conveyed directly to defendant Stevenson as trustee. On October 24th defendant Stevenson went to New York and had an interview with the attorney for the owners, where a new option was prepared and executed, in words and figures as follows:

"Memorandum of agreement between Charles O. Brewster, as attorney for the estate of Cyrus Wakefield and the estate of Joseph B. Thomas, as first party, and Luthei J. Stevenson, Frayer Halladay, Charles F. Young, and

Edwin Owen, of Grand Rapids, Mich., and Ward B. Miller, of Clarksville, Mich., as second party:

"*Whereas*, an option was made by said first party to E. A. Turnbull and others for the purchase of said lands in Gogebic county, Mich., dated September 16, 1903, and under said option the sum of $5,600 has been paid into the Grand Rapids Savings Bank, October 5, 1903, said payment being made in the following proportions, viz. :

"Luther J. Stevenson, $650.

"Ward B. Miller, $1,300.

"Frayer Halladay, $1,300.

"Charles F. Young, $1,300.

"Edwin Owen, $1,050.

"It is agreed by the parties hereto that said option, dated September 16, 1903, shall be terminated on or about October 27, 1903, and that thereafter the first party will tender proper deeds conveying the lands in question to the second party in proportion as they contributed to the sum of $5,600 on October 5th, 1903.

"The second party shall deposit in the Commercial Savings Bank in Grand Rapids, Mich., the sum of $5,600 on or before October 29, 1903, and thereupon the first party shall release the sum of $5,600 heretofore paid to the Grand Rapids Savings Bank October 5th, 1903; but, until such deposit is so made in the Commercial Savings Bank to bind this contract, the sum of $5,600 now in the Grand Rapids Savings Bank is to remain subject to the terms of the option dated September 16, 1903.

"Upon the payment of the sum of $49,934.07, in addition to the sum of $5,600 paid on account as above mentioned, the deeds are to be delivered by said bank to the second party.

"In case the second party refuses to complete the purchase of the lands within a reasonable time after deeds conveying a good and valid title are offered by the grantors, the said deposit of $5,600 is to be forfeited to the first party, as attorney, as aforesaid.

"It is understood and agreed that this agreement is subject and subsequent to the option of September 16, 1903, aforesaid, and shall be operative only and if and when the said option of September 16, 1903, has been terminated.

"Said party will immediately notify the parties to said option of September 16, 1903, that he elects to terminate the same unless performed by 3 p. m., October 27, 1903.

But if any party thereto fully complies with the terms thereof on or before said date, 3 p. m., October 27, 1903, this agreement shall be null and void.

"Dated October 24, 1903.

> "CHARLES O. BREWSTER,
>
> "Attorney for Estates of Cyrus Wakefield and Joseph B. Thomas.
>
> "LUTHER J. STEVENSON.
>
> "WARD B. MILLER.
>
> "FRAYER HALLADAY.
>
> "CHARLES F. YOUNG.
>
> "EDWIN OWEN."

This last arrangement was finally completed by a deed of the lands to the defendant Stevenson as trustee. The defendants refused to pay complainant anything or to give him any interest in the land, and he filed his bill to have his interest in the lands determined and to compel a conveyance of them to himself. The decree which was entered requires the defendant Stevenson to convey to complainant in severalty all of the lands except the 7,040 acres, and to convey to him also an undivided one-eighth interest in all of the other lands, and in default of such conveyance it is provided that the decree may be recorded and that it shall operate as a conveyance of said lands. It is from this decree that the defendants have appealed.

It is set out in the bill of complaint: That complainant learned on or about September 9th of the terms and conditions required by Mr. Brewster, and that Hart, in giving him the information, proposed that if complainant would find a purchaser for certain of the lands at a price which would pay the full sum asked for all the lands, he (Hart) would direct and cause a conveyance to be made to complainant of the balance of the lands. That the written memorandum of such proposition and agreement, already set out, was made. That, acting in reliance upon it, he procured purchasers upon the terms stated, and prepared and submitted to such intending purchasers a written proposition,—

"Offering to do certain things in the way of realizing

profits out of said lands in case of said purchase thereof, and among said things offered that, if said purchaser would pay substantially $56,000 for the said 7,040 acres of land, your orator would attend to the lumbering operations thereon and have nothing for his services until the net profits amounted to $190,000 to said purchasers; your orator, after the $190,000 profits had accrued, to have whatever remained of said lands and timber, or your orator to have out of said lands the mineral rights contained therein, or that your orator have a conveyance as a part of said purchase of an undivided one-eighth interest in all of said 7,040 acres of land. That your orator submitted said proposition to E. A. Turnbull, Frayer Halladay, Edwin Owen, and Luther J. Stevenson, and a little later to Ward B. Miller and Charles F. Young.

"That the said first-named parties agreed, if your orator would go upon said lands and show the same to them, or to such of them as they might designate, they would purchase the said lands through your orator upon the terms of said written proposition, electing for themselves which interest they would give your orator as specified in said proposition, provided said lands turned out upon examination to be as good as the estimate then furnished by your orator to them. And your orator, acting upon said agreement and understanding, at great expense to himself, again went upon said lands with the said parties first above named and a man hired by your orator for that purpose and spent many days and suffered great hardships and privations in exhibiting the said lands and the timber thereon to the said parties, who, after examining the same with your orator, declared that said lands were better than your orator had represented, and accepted the said proposition of your orator, and agreed to buy an undivided seven-eighth interest in said lands for the said sum of $56,000, taking a conveyance to themselves of said seven-eighth interest and to your orator an undivided one-eighth interest therein."

That, agreeably with the premises, the said intending purchasers prepared a document to be deposited in the Grand Rapids Savings Bank, together with 10 per cent. of the purchase price, which specified that they were to receive a conveyance of said 7,040 acres of land "according to the terms of a certain written option concerning the purchase thereof, which option is more fully described in

a later part of this bill." That at the same time said
Stevenson, Owen, and Halladay, with Miller and Young,
entered into a written contract and agreement, signed by
all of them, that they would purchase said 7,040 acres
and pay therefor $56,000, and that said instrument was
signed with the distinct understanding between said per-
sons and complainant that complainant was to have a
one-eighth interest in said lands.

"Your orator further shows that during all the nego-
tiations with said parties none other than the said 7,040
acres of land were shown them by your orator, or talked .
of or considered by the said Halladay, Owen, Stevenson,
Miller, and Young, or any of them. And according to
this agreement and understanding between them and
your orator, the said sum of $56,000 was to be paid by
them distinctly as the full purchase price of the said 7,040
acres of land and no more; and that a one-eighth interest
in said lands was to be conveyed to your orator."

The option which was first given by Mr. Brewster is
set out, with the averment that it was deposited in the
bank with the sum of $5,600 and with the written instru-
ment prepared by Stevenson, and that at the time the
$5,600 was deposited—

"None of the said proposed purchasers expected said
option would be in their names at all, but it was under-
stood and expected by all parties the said option would be
in the name of your orator; that by mistake in instructions
given to said Brewster the said option was prepared and
sent to said Hart in the form above mentioned, but was
allowed to remain in that form on account of the short
time remaining to comply with that option and in reliance
by your orator upon the said proposed purchasers that they
would carry out their agreement and understanding with
your orator. * * *

"That up to the time said money was deposited in the
bank as aforesaid, none of said parties, except the said
Hart and Brewster, knew that your orator, in addition to
the one-eighth interest in said 7,040 acres of land, was to
receive the other lands mentioned in said option; but
shortly thereafter they learned that the said Brewster had
agreed to convey all of said lands for the sum of $55,534,

and thereupon began to endeavor to procure a conveyance to themselves of all of said lands, including said 7,040 acres to themselves, thereby taking and receiving the benefit of the consideration so performed and paid by your orator, with the purpose as your orator is informed and believes, and therefore charges, of depriving your orator of all the benefit and advantages of his time and services in said transaction and interest in said lands."

To this bill, defendants Miller, Halladay, and Owen filed a joint and several answer. The defendant Stevenson filed an answer and cross-bill. The cross-bill was answered by complainant. The answers aver that complainant represented, and all dealings with him were based upon such representations, that he held an option from the owners upon the lands he was attempting to dispose of, and that the lands he described and sought to sell to defendants were all of the lands upon which he held such option, and were the entire holdings of the said estates in the towns in which said lands were situated, and that for said 7,040 acres of land the said estates were asking $56,000. They deny that they, with knowledge of the true facts, ever entered into any arrangement or agreement with complainant, or with such knowledge ever discussed with him the acceptance of any of his propositions, until, after learning of the alleged deceit practiced, they did so in an effort to compromise and settle with him and avoid expense and annoyance of possible litigation. It is also averred that complainant expressly represented that he was receiving no benefit or advantage out of the matter, excepting only the interest he proposed should be given to him by defendants; that the price he was paying to the owners was $8 per acre; that in an earlier option which he held upon the lands the price was fixed at $7.75 per acre; and that in seeking an extension of option to October 5th the price was raised to $8, which concession he was obliged to make to secure such extension. It is averred that defendants sought to see the alleged option before depositing their money in the bank and were put off with evasive and false assertions. Defendant Steven-

son claims, in his cross-bill, that complainant agreed to pay him one-half what he (complainant) realized out of the transaction.

The printed record contains more than 1,000 pages. The foregoing is an outline merely of facts and of claims disclosed by the record. Further references will be made to the testimony as discussion proceeds. The learned trial judge was of opinion that a valid contract, though one voidable for fraud at the option of defendants, existed between complainant and defendants, and that defendants must perform it, saying:

"I can find no case where a contract, otherwise valid, has failed of enforcement on account of fraud, where the party seeking to avoid it has insisted upon receiving its fruits."

*Ward & Brown*, for complainant.

*Clapperton & Owen* and *Don E. Minor* (*Loyal E. Knappen*, of counsel), for defendants.

OSTRANDER, J. (*after stating the facts*). The legal theory of complainant is thus stated in the brief:

"The defendants, having deliberately entered into the contract with full knowledge of all the facts now relied upon by them, are not in position to repudiate their arrangement with complainant as one brought about by his fraud and misrepresentation. They may not appropriate the benefits of a contract so far as it is to their advantage and repudiate it as to the rest. They must repudiate the contract entirely or not at all, and if they enter into the contract and claim its benefits they are in the same position as though no misrepresentations had been made."

And again:

"At the trial in the court below cases were cited on the subject of specific performance of contracts, but in the present case the complainant is not seeking to compel the defendants to enter into a contract nor really to perform a contract entered into. The defendants, without the consent of the complainant, entered into a contract and

thereby appropriated the benefit of complainant's services, which by the clear agreement and understanding of all the parties was to constitute the consideration of all these lands, over and above seven-eighths of 7,040 acres. The lands were conveyed to Stevenson as trustee, and thereby the case relieved of much uncertainty that might otherwise have resulted. All the complainant asks or needs to ask is that the amount of complainant's interest, already held by Stevenson as trustee, be declared. * * *

"The relation between complainant and defendants clearly became a binding contract, either upon the theory of the complainant or upon the history of the defendants. *First,* upon his own theory, he established a written proposition made by himself, adopted and acted upon by the defendants and himself, and ratified by the written agreement signed by them October 5th, to take the lands. These documents, together with the plat showing the description and location of the lands, constituted a complete written contract between the parties. *Second,* upon the admission of the defendants, a partly performed contract was established. The answers and the yellow letter supply everything needful to tne establishment of this fact. There was, therefore, a valid and binding contract relation existing between the parties, which might have been enforced either by the defendants upon their depositing their money in the bank, or by the complainant on the basis of the contract he made with defendants. Complainant, therefore, had a legal and equitable right to complain when defendants purchased the land directly from the owners and attempted to exclude him from the benefits."

It is further said:

"The fact that he [complainant] had no title to the land and no valid contract with the owners for their purchase would not prevent him from making a binding contract for their sale. Such contract could be enforced if he had the lands, and he could be held in damages if he did not have them."

It is sufficient to say of this last-stated proposition that complainant did not make a contract to sell to defendants any lands. The most that can be said of the testimony is that it is made to appear that upon the representations made by complainant defendants had agreed to purchase

7,040 acres of land for substantially $56,000, according to a corresponding option, and to give to complainant a one-eighth or equivalent interest, in consideration of his knowledge of the lands and of such an option, and his securing them the benefit of such option. There was no such option. The owners of the lands had not agreed to sell 7,040 acres for $56,000. Complainant did not procure nor secure to defendants the benefits of such an option. He did introduce defendants to a portion of the lands which were for sale. If, therefore, complainant is entitled to any consideration from defendants, it must be because they accepted the benefits of a different option, which the broker Hart was in duty bound to offer them, which came into existence, so far as the owners were concerned, because Hart represented that he had secured, according to the terms of his agency, purchasers of the lands.

I do not agree to the proposition advanced by counsel for complainant to the effect that, having discovered the terms of the option, defendants were, because of their relations with complainant, in duty bound to withdraw from its consideration and acceptance, with the alternative of paying the entire price asked for all the lands, giving to complainant a one-eighth interest in 7,040 acres and all of the remainder of the lands. The thing desired, the thing to be accomplished, was the sale and transfer of the lands. The terms according to which this transfer could be accomplished by the owners on the one side and the purchasers on the other were first discovered by the intending purchasers when the option was produced. This option was made after the fact, so far as any arrangement between complainant and defendants is concerned. The complainant had misrepresented to defendants the terms of sale which the owners proposed. The matter cannot be dismissed by the statement that the defendants were satisfied to pay for a part of the lands the price demanded for all of them. A different question would be presented if it could be found or assumed that, with knowledge of

the price demanded for all the lands, they had agreed to accept fewer acres for themselves and give the remainder to complainant. The testimony strongly supports the conclusion that the complainant had represented the fact to be that $56,000, substantially, was demanded by the owners for 7,040 acres; that the price had been lately raised; that complainant was interested only to secure for himself an interest in the said 7,040 acres. The plats and estimates which he exhibited were of 7,040 acres only. To purchase those lands, and no others, he represented would require $56,000, and he induced defendants to deposit one-tenth of this sum as an advance payment for the lands.

Treating complainant as an associate of defendants in the purchase of lands, the entire purchase price to be paid by defendants, we still are far from proper support for the decree. It is not claimed that defendants were to purchase more than 7,040 acres for the joint account. Suppose there had been no other lands, and, the deceit, not having been discovered, defendants had paid $56,000 for such lands, and the money in excess of $5.75 an acre had been taken by complainant. The fact being then discovered, would he be permitted to retain it? Could he have answered, legally, the demand for return of the money by saying that the transaction as made was a profitable one for defendants? Or that, if they had never discovered the fraud, they would have been satisfied with the bargain? And, if the deceit was discovered before payment of the purchase price, would the purchasers be precluded from acquiring the lands upon the terms of the owner because of their arrangement with their associate? The supposed case is not different, in substance and effect, from the case presented. I know of no rule which requires, under the circumstances disclosed, that the associates, thus deceived, shall any longer recognize the deceitful associate or treat with him with reference to the subject-matter.

The argument that the letter, sent to Brewster on Octo-

ber 6th, was a confirmation of the option, and that, as the option ran to complainant, with others, this confirmation of the terms of the option, with knowledge of the deceit practiced, was in law a confirmation of the arrangement with complainant, or, what is the potential equivalent, it amounted to a waiver or forgiving of the deceit, and all effects of it, is not sound. It is clear that the interested and responsible parties did not in fact waive or forgive the deceit which had been practiced. They sought, as I think they had the right to do, to avail themselves of the terms of sale proposed in the option. Complainant did not propose to contribute as a party named in the option, and is not asserting rights based upon the action of either the owners or purchasers which excluded him from the benefits of the option according to its terms.

Whether complainant be treated as an associate with defendants in the purchase of lands or a broker to invest their money, his relations were, in either case, fiduciary in character, requiring him to deal openly and truthfully with defendants. He did not do this. It should be said that but for the efforts of complainant it is probable that defendants would not have made a purchase, which, it may be assumed from the record, was profitable to them. It is, however, a long way from this fact to the conclusion, stated in the last paragraph of the bill of complaint, that—

"Your orator further shows that the said conveyance to the said Stevenson as trustee, aforesaid, was the sale procured by said Hart to your orator and the said Stevenson and his associates, and none other; that your orator actually paid the consideration for the conveyance of all of said lands [describing the 2,600 acres]; that the said conveyance was taken by the said Stevenson as trustee, without the consent and against the protest of your orator, and the said Stevenson holds all of the said lands last above mentioned as trustee for your orator, and also an undivided one-eighth part of all of said lands [the 7,040 acres]."

The decree is reversed, and a decree will be entered

dismissing the bill of complaint, with costs of both courts to defendants.

BLAIR, MONTGOMERY, HOOKER, and MOORE, JJ., concurred.